**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **JANE DOE,** : | |
| : | |
| **Plaintiff,** : | **Civil Action No.: 18-1733** |
| : | |
| **v.** : | **DEMAND FOR JURY TRIAL** |
| : | |
| **ST. JOHN'S UNIVERSITY,** : | |
| **and JACKIE LOCHRIE** : | |
| : | |
| **Defendants.** : | |

**COMPLAINT**

## I.      NATURE OF THE ACTION

1.      Plaintiff Jane Doe[1] ("Doe" or "Plaintiff") brings this lawsuit against Defendants St. John's University and Jackie Lochrie under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688 ("Title IX"), the New York City Human Rights Law ("NYCHRL"), NYC Admin. Code §8-107(4), and for breach of contract under New York State common law.

## II.      PRELIMINARY STATEMENT

2.      Plaintiff began her freshman year at St. John's University ("St. John's" or "the University") in the fall of 2016.  She was 18 years old and excited to begin a new chapter of her young life, away from home.  Doe looked forward to an academically challenging and socially fulfilling four years.  She also looked forward to being able to be openly gay and accepted on St. John's campus.  These hopes were irrevocably destroyed within two weeks after arriving on

---

[1] Plaintiff will file a motion to proceed using a pseudonym within 15 days after this case is assigned to a District Court Judge.

campus, when her two assigned roommates refused to live with her after learning that she was gay. This discrimination was condoned and further perpetuated by St. John's.

3.     Not only did Doe's former roommates, Susan Jones ("Jones") and Sally Smith ("Smith"),[2] immediately seek to transfer out of the assigned room after learning Doe was gay, but they further discriminated against her by filing an "Incident Report" with the University one day after learning that Doe was a lesbian. In that report, Jones and Smith falsely accused Plaintiff of making unwanted sexual advances toward one or more of them. Upon information and belief, Doe's former roommates made the false accusations to justify their request for an expedited transfer out of the room they shared with Doe.

4.     On the day that Doe's former roommates moved out of their shared room, Doe began complaining to several University employees, including to St. John's Title IX Deputy Coordinator about student on student discrimination. Doe specifically informed all of these employees that she believed her roommates had moved out of their shared room because they disliked, felt uncomfortable and threatened by Doe because of her sexual orientation.

5.     St. John's had a legal duty to investigate Doe's discrimination complaints about her former roommates. Notwithstanding this duty, St. John's refused to initiate any investigation whatsoever regarding Doe's complaints about gender and sexual orientation discrimination. St. John's actions allowed the discrimination by Doe's former roommates to continue unabated, subjecting Doe to a hostile environment on campus.

6.     In addition, the University further discriminated against Doe by failing to provide her with any due process rights and/or a forum in which she could challenge the unfounded accusations of sexual misconduct that had been lodged against her. Upon information and belief,

---

[2] Susan Jones and Sally Smith are not the real names of the students referenced in this Complaint. Their names have been made anonymous to protect their privacy in this lawsuit.

similarly situated male students, accused of sexual advances or worse, would have been provided with an opportunity to challenge such false charges through direct confrontation with Jones and Smith, as well as to rely upon other witnesses to rebut these stigmatizing and untrue accusations. Doe, however, was never given the opportunity to clear her name and instead remained branded within the college community as a gay student who harassed and assaulted other female students.

7.     Upon information and belief, had St. John's provided Doe with a forum to challenge her former roommates' accusations, the evidence would have shown that these accusations were not only false, but that they had been made in bad faith for the purpose of being able to move out of the room they shared with Doe.  Moreover, should the evidence have demonstrated the falsity of these accusations, these former roommates should have been disciplined according to St. John's own policies.  Upon information and belief, both Jones and Smith remain as students at St. John's and have never faced any negative repercussions for discriminating against or making untrue accusations against Doe.

8.     Doe, however, was devastated by the discrimination and falsehoods lodged against her.  After Jones and Smith made the accusations, Doe's social life suffered in her dormitory.  She was afraid to be seen by her former roommates who also lived in the same building after they moved out of the shared room.  She also felt uncomfortable seeing any of their mutual friends, who knew that Jones and Smith had transferred out of the room Doe, Jones and Smith had previously shared.

9.     Doe became self-conscious about being an openly gay woman on St. John's campus.  She feared that revealing that she was gay to other students or faculty on campus would result in further rejection.  Moreover, she had to live with the stigma of being accused of being a sexual predator, which was not only untrue, but which she believed was based on the discomfort

and prejudice Jones and Smith felt towards her because she was gay.

10.     Doe became depressed, anxious and fearful living on campus, especially in the same dormitory as her former roommates.  This affected her ability to socialize as well as to study and to be successful in her classes.  When living and attending school on St. John's campus became unbearable, she applied to transfer out of St. John's in the fall of 2016.  Doe currently attends the State University of New York at New Paltz.

### III.   PARTIES

11.     Plaintiff is a 19-year-old woman whose legal residence is in Newtown, Connecticut.

12.     Defendant, St. John's, is a private, non-profit, Catholic-affiliated University located at 8000 Utopia Parkway, Queens, New York 11439.  Notwithstanding its Catholic affiliations, St. John's is a recipient of federal financial assistance within the meaning of 20 U.S.C. § 1681(a), and therefore cannot rely upon any religious affiliation or doctrinal views to justify discriminating against students on the basis of gender and/or sexual orientation.

13.     At all times relevant to this case, Defendant Jackie Lochrie ("Lochrie") was the Associate Dean for Student Services and the Title IX Deputy Coordinator for the Division of Student Affairs at St. John's.  As such, it was her responsibility to receive and investigate complaints about gender and sexual orientation discrimination between students.  According to St. John's policies, she was also the designated faculty member to whom students could complain about sexual misconduct on campus.

## IV.    JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over the Plaintiff's federal

law claims pursuant to 28 U.S.C. § 1331.  In addition, Plaintiff brings her complaint under

federal diversity jurisdiction, 28 U.S.C. § 1332, as the parties are completely diverse in

citizenship and the amount in controversy exceeds $75,000.

15.    The Court has supplemental jurisdiction over the Plaintiff's New York City and

New York State common law claims pursuant to 28 U.S.C. § 1367, since those claims are related

to Plaintiff's federal law claims and they form part of the same case or controversy.

16.    Venue is proper within the Eastern District of New York, Brooklyn,

pursuant to 28 U.S.C. §§ 1391(b)(1) and (2), because the Defendant is located in Queens, New

York and the conduct underlying the Plaintiffs' claims occurred in Queens, New York.

## V.    FACTS

### A.  Doe Matriculates at St. John's

17**.**    In the spring of 2016, Doe applied for admission to, and was accepted by, St.

John's.  She began her freshman year at the University in August of 2016.

18.    Doe chose to apply to St. John's for a variety of reasons, including

its internationally recognized reputation and excellent communications department.  At the time

of her application to the University, Doe was interested in majoring in communications.

19.    Doe also decided to attend St. John's because of its location in

New York City and its claimed commitment to diversity and non-discrimination.[3]  As a lesbian

woman, Doe knew that living in New York City would be a relatively safe and welcoming

---

[3]  Section D of St. John's Code of Student Conduct reads: It is imperative for St. John's University to be
an institution where all members of our community feel safe to acquire knowledge and to pursue their
academic interests. In order to support the learning environment appropriately, St. John's University shall

community, as opposed to many other areas in the country.  Therefore, she chose to attend a

school in one of the most diverse and inclusive cities in the United States where she anticipated

she could be openly gay.

20.     In the spring of 2016, after being accepted into the class of 2020,

Doe was assigned to share a room with Jones and Smith, both female students from El Paso,

Texas.  Jones and Smith were friends before arriving at St. John's.

21.     All three roommates communicated throughout the spring and

Summer of 2016, before "move-in" day.  These communications were conducted predominately

through text messages and social media interactions.  These communications were friendly and

warm.

22.     On August 27, 2016, Doe moved into the dormitory room in Donovan

Hall, a residence hall on St. John's campus in Queens.  Jones and Smith moved in that same day.

For the next 10 days, Doe socialized with Jones and Smith both in and outside of their shared

dormitory room.  The three students ate together in the dining hall, attended parties, and spent

hours talking in their shared room.  Doe felt particularly close to Jones with whom she believed

she was developing a close friendship.

**B.  Doe Tells Her Roommates She is a Lesbian**

23.      On September 8, 2016, Doe, Jones and Smith met to have dinner

together in Merilac Hall.  According to Plaintiff, the mood was lighthearted and there was a lot

of laughter at dinner.

---

not tolerate bias-related offenses in our community. Available at www.stjohns.edu/student-life/student-conduct/code-conduct/general-provision

24.    At some point during the dinner, Jones and Smith began discussing which "boys" on campus they each found attractive.  Doe responded that she was not attracted to any of the "boys" because she was a lesbian.  Following that disclosure, there was an immediate, palpable change in the mood of the dinner.

25.    Jones instantly stopped talking to Doe and no longer made eye contact with her for the rest of the dinner.  Smith appeared visibly uncomfortable and surprised.  The dinner ended abruptly and the women walked back to Donovan Hall in awkward silence.  Doe was humiliated and confused.

**C.  Doe, Jones and Smith Attend a Previously Scheduled Meeting with Their Resident Advisor**

26.    Within an hour after returning to Donovan Hall from dinner, all three students convened in their shared dormitory room to meet with Resident Advisor ("R.A.") Kaylee Kosakowski ("Kosakowski").  The purpose of this meeting was to discuss roommate rules.  Kosakowski had prearranged this roommate meeting before the dinner in Merilac Hall took place.

27.    Pursuant to St. John's policies, freshman roommates are supposed to meet with the dormitory R.A. early in the semester to create a "roommate agreement" or "contract."  The roommate agreement or contract is intended to establish "ground rules" for co-living between roommates in order to better navigate a shared living situation.

28.    During the meeting, each of the students sat on their own beds.  Kosakowski reviewed a list of questions with the three roommates.  These questions were intended to determine preferences and potential objections that would be included in the roommate agreement or contract.

29.     At the end of the meeting, Kosakowski asked if there was anything else any of the students wanted to add.  Both Jones and Smith emphatically stated that they wanted each of the roommates to change their clothes in the privacy of the bathroom and not in the shared bedroom.  Before Doe disclosed that she was a lesbian, all three roommates had regularly changed their clothes in the shared bedroom without incident, protest or concern.

30.     Doe understood this request to be a direct reaction to their discomfort with her being a lesbian and that it was based on unsupported stereotypes that because she was gay she would automatically be sexually interested in either of them – or worse, that she might sexually attack them.  Doe experienced this request as hurtful and humiliating.  Notwithstanding her feelings, in an effort to avoid further conflict, Doe agreed to this request.

31.     After the meeting, Kosakowski left the shared room.  Approximately three minutes later, Jones and Smith followed.

32.     Doe left the room after Jones and Smith and walked down the hall to the elevator, passing Kosakowski's room on the way.  As Doe walked passed the R.A.'s room, she overhead Jones saying that she was uncomfortable living with Plaintiff.  It sounded to Doe as if Smith agreed with this sentiment.

33.     Doe was devastated to hear that her roommates were rejecting her, particularly because their camaraderie and budding friendship had been an important part of her transition from home to college life.  Moreover, Plaintiff felt rejected and humiliated on the basis of being a gay woman.

**D.   Jones and Smith Move Out of The Shared Room**

34.     On September 8, 2016, all three roommates slept in their shared room, although there was no discussion among them about what had occurred that evening.

35.     On September 9, 2016, Doe traveled to Boston for a pre-arranged weekend trip.  She returned to St. John's on Sunday, September 11, 2016.  When she returned to her dorm room, all of Smith's wall hangings had been taken down.

36.     On the evening of September 11, 2016, Jones and Smith returned to the shared room with a group of friends.  They both packed overnight bags.  Smith told Doe that they were staying with friends for a "few days."  Jones did not make eye contact with Doe.  The other young women who accompanied Jones and Smith appeared to Doe to be uncomfortable.  Shortly after packing their belongings, Jones, Smith and their friends left the room.  Doe was left alone, feeling abandoned, humiliated, and rejected and extremely self-conscious about her sexual orientation.

37.     The next afternoon on September 12th, Jones and Smith returned to the room and informed Doe they were moving out.  They were accompanied by Kosakowski.  It appeared to Doe that Kosakowski had been assigned to escort Jones and Smith as they packed up their belongings in order to prevent any conflict between Doe and her former roommates.  Again, Jones did not speak and/or make eye contact with Doe.  Kosakowski instructed Doe to leave the room for an hour.

38.     Doe left the room and began to cry.  She felt deeply rejected and humiliated; and for one of the first times in her life felt incredibly self-conscious about being gay.

39.     Doe returned to the room approximately one hour later.  All of Jones' and Smith's belongings, including their bedding, were gone.  Doe felt abandoned.

### E.  Doe Complains to Resident Director Azconza About Sexual Orientation Discrimination

40.     On September 12, 2016, the same day as Jones and Smith moved out of the shared dormitory room, Plaintiff sought out and met with Donovan Hall's Resident Director,

Claribel Azcona ("Azcona").  This meeting took place in Azcona's office, located in Donovan Hall.  Upon information and belief, Azcona is responsible for supervising the dormitory R.A.s and for handling student-on-student issues in the dormitory.

41.     Doe complained to Azcona about her two former roommates, claiming that they were biased against her because she was gay and asserting that they held outdated stereotypes about lesbian women.  Doe told Azcona that she believed that as a result of these views, Jones and Smith were afraid to live with her.  As part of the complaint to Azcona, Doe relayed the facts leading up to her former roommates' abrupt rejection of her, just seconds after disclosing she was gay.

42.     Azcona disputed Doe's complaint and told her that that Jones and Smith had not moved out because Doe was gay.  Instead, she maintained that the two former roommates had moved out of the room because, as they reported it, Doe had made "unwanted sexual advances" and "inappropriately touched" one or both of these young women.

43.     Azcona told Doe that as a result of her actions, Jones and Smith had filed a complaint with the University in the form of an "Incident Report."  She told Doe that the University's Security Office also had issued a "No Contact Order."  She advised Plaintiff to check her e-mail inbox for a copy.

44.     Doe was shocked to hear that she was being accused of sexual misconduct – conduct that she vehemently denies.  Plaintiff began to cry in front of Azcona.

45.     Azcona did not comfort Doe.  Moreover, she ignored Plaintiff's complaints about gender and sexual orientation discrimination.  Azcona neither advised her to file a complaint of discrimination nor recommended to whom or what office she could go to file such a complaint.

Upon information and belief, Azcona had already determined that there could be no basis for Doe's discrimination complaints.

**F.   The University Issues a No Contact Order Against Doe**

46.     At the end of the meeting with Azcona, Doe returned to her dorm room and looked in her email inbox for a copy of the "No Contact Order." There she found the document issued by Jack Flynn ("Flynn"), Director of Student Conduct.

47.     The "No Contact Order" instructed Doe to refrain from all contact with Jones and Smith and to make reasonable accommodations to both her "academic and social pursuits to avoid being in the same room with [Smith and Jones]."

48.     Despite the limitations to her schedule and restrictions in being able to move freely within Donovan Hall, Doe was never given specific details about the accusations made by Jones and Smith that would support a "No Contact Order."  Doe felt like an accused criminal and sexual deviant and was further humiliated and stigmatized because of her sexual orientation by these unfounded accusations.

**G.   Doe Complains to the Title IX Deputy Coordinator About Discrimination**

49.     On or about September 12, 2016, Doe contacted Lochrie, St. John's Title IX Deputy Coordinator, and scheduled an appointment for the next day, September 13th.

50.     On September 13, 2016, Doe met with Lochrie in her office located on campus. Doe again complained that her former roommates had discriminated against her on the basis of her sexual orientation and related gender stereotypes.  She told Lochrie that she believed that the discrimination had been the real reason they had moved out of their shared dormitory room.

51.     In her capacity as Title IX Deputy Coordinator, Lochrie is responsible for accepting and investigating complaints of student discrimination on the basis of gender and/or sexual orientation and/or relaying claims of discrimination to St. John's Title IX Coordinator.

52.     At the meeting on September 13, 2016, Lochrie never informed Doe that she had a right to attend St. John's free of discrimination on the basis of gender and/or sexual orientation. Nor did Lochrie inform Plaintiff that she had the right to have her complaints of discrimination investigated.  Lochrie never told Doe that the University would not retaliate against her for bringing these complaints forward.

53.     Without advice from the University, and without consultation with legal counsel, Doe brought to the meeting with Lochrie a multi-page document setting forth some of the details related to her discrimination complaint.

54.     Lochrie did not review the written document that Doe presented to her at the meeting, nor did she ask Doe any questions about the document on that day, or at anytime since.

55.     Lochrie also never informed Doe that she, or any other individual employed by St. John's, would investigate her discrimination complaint.  In fact, no investigation was ever conducted.

**H.     Lochrie Never Addresses The Accusations Lodged Against Doe or Provides Her With Any Due Process Rights To Challenge These Accusations**

56.     According to St. John's policies posted on its website, Lochrie is also the designated University employee that handles student on student sexual misconduct complaints.[4]

---

[4] See St. John's University Policy 703 – Sexual Misconduct Policy and Procedures available at www.stjohns.edu/about/administrative-offices/human-resources/hr-policy-manual/policy-703-sexual-misconduct-policy-and-procedures#V.

57.     On September 13, 2016, Doe also asked Lochrie to explain to her what she had been accused of doing that had been interpreted by her former roommates as sexual misconduct and what alleged facts would justify the "No Contact Order."

58.     Lochrie told her there was an "Incident Report" filed by her two former roommates with the Office of Student Safety, but that she could not share any details about the Incident Report because some or all of the information contained within the document was "confidential."

59.     According to St. John's Sexual Misconduct Policy, a student accused of sexual misconduct is entitled to a significant measure of due process.[5]  This includes a requirement that St. John's make an initial determination, or assessment of the accusation of sexual misconduct. In this case, the University failed to make any type of assessment as to the credibility of the accusations made by Jones and Smith.  Instead, it deferred to the information provided by Jones and Smith that has remained unchallenged to this day.

60.     Moreover, the University failed to provide Doe with any written documentation of what she was being accused of in violation of its own policies.[6]  Without this information, Doe was rendered helpless to combat the serious accusations of misbehavior and/or criminal conduct alleged against her.

61.     St. John's also has an internal requirement that the University conduct an unbiased investigation into Jones and Smith's accusations.[7] Had St. John's complied with its own policies, it would have determined the extent, if any, that gender bias and stereotyping were a motivating factor in Jones' and Smith's decision to file an Incident Report against Doe.

---

[5] See n. 4, supra.
[6] See n. 4, supra.
[7] See n. 4 supra.

62.     Upon information and belief, had the University followed its own internal procedures and conducted an investigation into Jones' and Smith's accusations against Plaintiff (as documented in the Incident Report and used to support the filing of a "No Contact Order" against Plaintiff), it would have determined that there was, at best, insufficient evidence to prove by a preponderance of the evidence that Doe had been sexually inappropriate with Jones or Smith.[8]

63.     Moreover, under the Student Conduct Process for adjudicating complaints, including those for sexual misconduct, the accused is entitled to notice of the accusations that have been lodged against them, the assistance of a faculty advisor, an unbiased hearing, and the right to an appeal.[9]

64.     Lochrie never informed Doe that she had any due process rights under St. John's policies and procedures that she could use to challenge and rebut Jones' and Smith's accusations of sexual misconduct.  Nor was she provided with faculty assistance, a hearing or any appeal rights.

**I.   The No Contact Order is Dropped**

65.     At the September 13th meeting, Lochrie told Doe that Smith and Jones were interested in resolving the matter and they wanted to dismiss the No Contact Order.

66.     Within a few hours after Doe left the meeting with Lochrie, Plaintiff received an e-mail from Lochrie informing her that based on Doe's request, the No Contact Order was being dismissed.  In fact, although Doe did not object to the dismissal, the No Contact Order was dismissed at the request of Jones and Smith.

---

[8] See n. 4, supra.
[9] See St. John's University Code of Conduct General Provision, Section E: Rights of Students available at www.stjohns.edu/student-life/student-conduct/code-conduct/general-provision.

67.     In the e-mail from Lochrie, the Title IX Deputy Coordinator also reminded Doe that "retaliation" on Doe's part "would not be tolerated."  Upon information and belief, Smith and Jones were never told about the complaints made by Doe against them and were never cautioned that they should not retaliate against Plaintiff.

68.     Upon further information and belief, the University would not ordinarily dismiss such a No Contact Order merely at the request of the victims, who no more than few days earlier had gone to the University's Security Office and relayed a falsified threat so as to justify the Order in the first place.

**J.  The Incident Report Remains on File**

69.     Although the No Contact Order was dismissed, the Incident Report, which includes false allegations of sexual misconduct and formed the basis for the "No Contact Order," remains on file at St. John's.

70.     Upon information and belief, the Incident Report remains connected to Doe's student record at St. John's and can be retained for up to seven years from the date of filing.

71.     Upon further information and belief, even if another school, employer, licensing organization, credentialing entity, government or law enforcement agency cannot obtain a copy of the Incident Report itself, Doe must still answer truthfully to these parties about being charged with sexual misconduct.

**K.  Doe is Humiliated By Her Treatment at St. John's And Fearful About Remaining on Campus**

72.     After the University permitted Jones and Smith to discriminate against Doe by moving out of their shared dorm room because Doe was gay, Doe felt abandoned and lonely.  Approximately five weeks later, she was assigned another roommate with whom she

had no prior relationship or rapport.  She was terrified that this roommate would learn she was gay and that she would also move out of the room.

73.     After being accused of sexual misconduct, Doe was embarrassed to socialize with any of the friends or classmates of Jones and/or Smith.  Doe was also petrified to be seen in Donovan Hall, her dormitory, where students both live and regularly gather to socialize, or to potentially meet Jones and/or Smith or their friends anywhere on campus.  As a result, Doe became even more afraid and anxious to walk around campus, negatively affecting her ability to access her education and to succeed in her coursework.

**L.   Doe Seeks to Transfer out of St. John's**

74.     As a result of feeling humiliated, ostracized, unwelcomed and unprotected at St. John's, Doe began to have trouble studying and focusing.  In addition, she felt self-conscious about being a gay woman on St. John's campus.

75.     Doe decided to transfer out of St. John's when her distress reached a level where she could no longer apply her attention to her studies, and when she felt threatened and unsafe on St. John's campus.

76.     In transferring out of St. John's, Doe was foregoing a fifty percent scholarship attached to her tuition.

77.     Doe applied to two schools in the late fall of 2016: the State University at New York ("SUNY") in New Paltz and Emerson College in Boston.  Both schools allowed late fall applications and mid-year transfers.

78.     Doe was accepted at both schools but was unable to get financial aid at Emerson as a mid-year transfer.  As a result, she accepted SUNY New Paltz's offer and transferred into that school for the spring semester of 2017.

16

79.     Doe continues to miss out on the opportunity to live, socialize and experience the cultural and potential career benefits of living in New York City.

**M.   A St. John's Faculty Member Suggests That Homophobia
       May Be Accepted On Campus Because of The University's
       Catholic Affiliations**

80.     After Doe decided to transfer out of St. John's, she asked her faculty advisor, Gerard Cajas ("Cajas") to help obtain her academic transcript, a document she needed in order to apply to other colleges.

81.     Cajas asked Doe why she was transferring.  Plaintiff told him about the situation with her roommates, including their bias against her as a lesbian, their rapid departure from their previously shared dormitory room and the unfounded accusations they had filed against her, claiming that she had been sexually inappropriate with one or both of them.

82.     Doe also informed Cajas of the fact that St. John's had never even investigated her discrimination complaints nor had it given her the chance to clear her name against the false accusations made by Jones and Smith.

83.     Cajas' listened to Doe's complaints.  Doe experienced his tone of voice and demeanor to be sympathetic.  However, his words were less reassuring.  Cajas told Doe that she should not to be "surprised" by St. John's reaction to her discrimination complaints or failure to provide her with any due process rights to challenge the unfounded accusations made by Jones and Smith because St. John's was a "Catholic school."  Plaintiff was shocked to hear this statement from her Advisor.  She was further deeply disturbed that St. John's could possibly justify its discrimination against her on the basis of its Catholic affiliation.

84.     Notwithstanding its Catholic affiliation, St. John's receives government funding and must comply with the mandates of Title IX.  Both Title IX and the NYCHRL mandate that

the University provide an equal education to all students regardless of gender and/or sexual orientation.

**N.    St. John's Fails to Investigate Doe's Discrimination Complaints
       Because of Her Gender and Sexual Orientation**

85.    St. John's had a legal duty under Title IX and the NYCHRL to ensure that Doe was provided with an equal education free of gender and sexual orientation discrimination.

86.    St. John's was legally required to remedy discrimination, of which it was on notice, and to make the on-campus environment safe and welcoming for Doe.

87.    Doe complained to the appropriate individuals at St. John's University, including Kosakowski, Azcona, Cajas and Lochrie, St. John's Title IX Deputy Director about gender and sexual orientation discrimination.  Nonetheless, not one single University employee ever took a single step to investigate her complaints of gender stereotyping and sexual orientation discrimination.

88.    Upon information and belief, had the University initiated such an investigation it would have determined that Jones and Smith were, in fact, uncomfortable and threatened by living with a lesbian roommate and that their complaints against Doe were based on this discomfort as well as outdated gender-based stereotyping.  Upon information and belief, had St. John's conducted an investigation of Doe's complaints it could have fairly determined that Jones and Smith used false accusations of sexual misconduct, purported to have been carried out by Doe, to expedite their transfer out of the room to which they were originally assigned.

**O.     St. John's Further Discriminates Against Doe When The University
        Defers to Jones and Smith's Explanation As to Why They Moved Out
        of The Shared Dormitory Room**

89.     St. John's accepted Jones' and Smith's accusations of sexual misconduct by Doe

on their face without ever providing an opportunity for Doe to challenge the accusations through

a process in which she could confront her accusers, cross examine them and bring additional

witnesses to a hearing or other forum.  This is in violation of both St. John's Sexual Misconduct

Policy and Student Conduct Code.[10]

90.     The University denied Doe these due process rights, notwithstanding that at the

exact same time as Jones and Smith accused Doe of sexual misconduct, Doe was complaining

about gender bias and homophobia on the part of Jones and Smith.

91.      St. John's refusal to investigate Doe's discrimination complaints and its

deference to the accusations of Jones' and Smith's claims that Doe had inappropriately touched

one or more of them, perpetuated the discrimination against Doe on the basis of her sexual

orientation.

**P.     St. John's Discriminates Against Doe On The Basis of Her Gender
        and Sexual Orientation when They Fail To Provide Her With
        The Same Due Process Rights They Would Have Provided a Male,
        Non-Gay Student**

92.     St. John's never provided Doe with an opportunity or forum in which she could

challenge and/or rebut the accusations of sexual misconduct made against her so that she could

redeem her good name and reputation on campus and beyond.

93.     Upon information and belief, St. John's would have provided a male student

accused of unwanted sexual touching or worse the right to challenge his accusers and clear his

name.  The University withheld these rights to Doe, a female gay student.

---

[10] See notes 4 and 8, supra.

**Q.    St. John's Fails to Follow Its Own Internal Policies**

94.    St. John's failed to follow its own internal policies at every point at

in time in which could have made a difference to Doe's experience on campus.  The University's

failure to follow its own procedures is further evidence of discrimination on the basis of gender

and sexual orientation against Doe.

95.    Upon information and belief, before a student can transfer out of a

shared room, St. John's requires the students to enter into a mediation process in which students

are asked to attempt to resolve their differences.

96.    By requiring all three students to sit down with an assigned mediator,

St. John's could have explored misconceptions about living with a lesbian student and resolved

any concerns with sensitivity and care, allowing Jones and Smith to remain living with Doe.

97.    If a mediated discussion between Doe, Jones and Smith did not resolve the

conflict the other two students had with Doe, then the University would have been on notice of

the homophobic bias that was motivating the requested room transfer.

98.    Upon information and belief, St. John's would never have permitted a

a student to transfer out of a dormitory room because of their discomfort with an assigned

roommates' race, religion or national origin.

99.    St. John's also violated its own policies that require the University to investigate

complaints about gender and sexual orientation discrimination, as well as to provide extensive

due process rights to students accused of sexual misconduct.[11]

100.    Jones' and Smith's unfounded accusations against Doe should have been

addressed pursuant to the University's policies to ensure the legitimacy of their sexual

misconduct complaint process.  By failing to take even minimal steps to ascertain the truth of

_____

[11] See n. 4, supra.

these allegations, the University allowed their false allegations to stand unchallenged.  In doing

this, St. John's permitted discrimination against Doe to continue unchecked.

101.    These unsupported and unchallenged accusations remained as a warning and

stigma to Doe throughout the rest of her enrollment at St. John's and forced her to flee to another

college where she could be safe and feel comfortable to express her sexual orientation freely.

**VI.    CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**
**SEX DISCRIMINATION IN VIOLATION OF TITLE IX**
**OF THE EDUCATIONAL AMENDMENTS OF 1972, 20 U.S.C. § 1681**
**AGAINST ST. JOHN'S**

102.    Doe incorporates by reference each and every allegation in paragraphs 1 through

101, above.

103.    Under Title IX, St. John's had a legal obligation to ensure that Doe was able to

enjoy the benefits and privileges of attending the University free from bias, prejudice and

discrimination on the basis of her sex, including sex stereotyping and discrimination on the basis

of her sexual orientation.

104.    Doe experienced discrimination on the basis of sex in a context

that was subject to St. John's control and where St. John's could have taken remedial action.

105.    St. John's had actual knowledge of the harassment sustained by

Doe because she complained multiple times to the appropriate University employees, including

St. John's Deputy Title IX Coordinator, whose responsibility it is to investigate claims of sex

discrimination.

106.    St. John's had a legal obligation to remedy all known forms of sex-

based harassment and discrimination.  Notwithstanding this obligation, the University refused to

investigate Doe's complaints of discrimination.

107.    St. John's further discriminated against Doe on the basis of her sex by refusing to investigate Jones' and Smith's unsubstantiated accusations against Doe, thereby failing to investigate further student-on-student sex discrimination against Plaintiff.  As a result, St. John's made Plaintiff increasingly vulnerable to further harassment and discrimination on campus.

108.    St. John's never provided Doe with any form of due process in order for her to rebut the accusations of sexual misconduct leveled against her by Jones and Smith.  As a student accused of sexual misconduct, she had certain rights guaranteed to her under Title IX that St. John's violated because of her sex.

109.    St. John's conduct in ignoring Doe's complaints about sex discrimination and allowing her reputation to be besmirched without any due process in which to refute the accusations was deliberately indifferent, insofar as the response, or lack thereof, was clearly unreasonable in light of the known circumstances.

110.    As a result of St. John's actions, Doe suffered ongoing emotional distress and incurred costs related to transferring out of St. John's.  She also lost the opportunity to attend St. John's and to attend a college in New York City, one of the primary reasons she chose to matriculate at St. John's.

111.    St. John's retaliated against Doe by failing to investigate her complaints about gender and sexual orientation discrimination after she reported her complaints of discrimination to various University employees.

### SECOND CAUSE OF ACTION
### VIOLATION OF THE NYCHRL, § 8-107(4) AGAINST
### ST. JOHN'S AND DEFENDANT LOCHRIE

112.    Doe incorporates by reference each and every allegation in paragraphs 1 through 111, above.

113.    St. John's is a provider of public accommodations within the meaning

of the NYCHRL.

114.    Doe was denied full and equal enjoyment of an educational

opportunity while attending St. John's on account of gender stereotyping and sexual orientation.

This occurred when St. John's perpetuated a hostile environment created by Jones and Smith by

failing to investigate her complaints of discriminatory treatment; by failing to remedy her

complaints of discrimination; and by failing to absolve Doe of unfounded accusations of sexual

misconduct.

115.    St. John's never investigated the pernicious and damaging

accusations leveled against Doe by Jones and Smith, despite the fact that Doe refuted those

allegations and provided extensive information to support the claim that her former roommates

were using these accusations as a tool to discriminate and harass Doe, as well as a cover to

justify moving out of the shared dorm room.

116.    St. John's conduct not only condoned, but encouraged the

homophobic bias and related mistreatment against Doe while she was a student at St. John's.

117.    As a result of St. John's intentional and willful refusal to even

investigate Doe's complaints about discrimination on the basis of gender and sexual orientation,

Doe was pushed out of St. John's and forced to transfer to another university.

118.    St. John's further retaliated against Doe for filing complaints about discrimination

on the basis of gender and sexual orientation by failing to investigate her complaints and by

allowing unfounded accusations against her to remain on file with the University.

## THIRD CAUSE OF ACTION
## BREACH OF CONTRACT AGAINST ST. JOHN'S

119.    Doe incorporates by reference each and every allegation in

paragraphs 1 through 118, above.

120.    St. John's maintains through its policies and practices that it's campuses are non-

discriminatory environments that welcome students of all genders and different sexual

orientations.

121.    For instance, St. John's non-discrimination policy provides that the University

"does not discriminate on the basis of … sex (including sexual harassment and sexual violence),

sexual orientation, gender identity and gender expression as required by Title IX of the

Educational Amendments of 1972, Title VII of the Civil Rights Act of 1964, and other

applicable statutes and University policies."[12]

122.    St. John's failed to ensure that those policies were enforced so that Doe could

enjoy a welcoming and safe environment while attending at St. John's, free of discrimination and

bias on the basis of her gender and/or sexual orientation.

123.    St. John's had policies in place at the time of the events contained in this

Complaint that required the University to attempt to mediate student disputes with regard to

room assignments, before a student could move out of a shared room.  Specifically, the

University had a mediation process that was supposed to be utilized to resolve roommate

conflicts.

---

[12] St. John's Notice of Non-Discrimination, Equal Opportunity available at
www.stjohns.edu/policies#nondiscrimination.

124.    St. John's violated its own internal policies by ignoring this mediation requirement and instead permitting Jones and Smith to move out of the shared room as soon as possible after discovering that Doe was gay.

125.    St. John's had policies in place at the time of the events in question that required the University to take seriously all complaints of student-on-student discrimination, including those based on gender and sexual orientation; to investigate all complaints alleging such discrimination; and to remedy the discrimination where discrimination was determined to have occurred.

126.    St. John's failed to comply with its own internal policies to investigate Doe's multiple complaints about gender and sexual orientation discrimination.  In doing so, St. John's violated its internal policies to make its campus safe and welcoming to Doe, regardless of her gender and/or sexual orientation.

127.    St. John's had policies in place at the time of the facts alleged in this Complaint that would provide a fair and impartial due process forum and procedure in which a student accused of sexual harassment, assault or misconduct could confront their accusers; and if the accusers were found to have lied or distorted the facts, to vindicate themselves of unfounded accusations.

128.    St. John's failed to follow its own policies to provide Doe with these due process rights and a forum in which to enforce these rights, thereby leaving Plaintiff with no way to clear her name or take on the reason for Jones and Smith's false accusations.

## VII.   DEMAND FOR RELIEF

**WHEREFORE,** the Plaintiffs request that this Court:

A.   Issue a Declaratory Judgment against St. John's holding that the University violated Title IX and the New York City Human Rights Law in its conduct toward Plaintiff;

B.   Issue an Order and Injunction directing St. John's to remedy its policies and practices to comply with Title IX and the NYCHRL;

C.   Award Plaintiff economic and consequential damages for harm caused by Defendants' discriminatory conduct and harassment in violation of Title IX, the NYCHRL and St. John's own internal policies and procedures, in an amount to be proven at trial;

D.   Award Plaintiff compensatory damages for pain and suffering as relates to Defendants' discriminatory conduct and harassment in violation of Title IX, the NYCHRL and St. John's own internal policies and procedures in an amount to be proven at trial;

E.   Award Plaintiff punitive damages for Defendants' willful or wanton negligence, or recklessness, or conscious disregard of Doe's legal rights under the NYCHRL;

F.   Award Plaintiff reasonable attorneys' fees and costs expended in litigating this matter; and

G.   Award to Plaintiff such other relief as is deemed just and proper by this Court.

## JURY DEMAND

Plaintiff demands a jury trial on all counts set forth in this Complaint.

Respectfully Submitted,

GENDER EQUALITY LAW CENTER, INC.

By          /s/ *Allegra L. Fishel*

_____

Allegra L. Fishel (AF: 4866)
540 President Street, 3rd Floor
Brooklyn, New York 11215
Tel.:  (347) 844-9003 – Ext. 1
E-mail:  afishel@genderequalitylaw.org

KONDIARIS LAW

By:      */s/Olympias Iliana Konidaris*

_____

Olympias Iliana Konidaris (OK: 8580)
41 East 11th St., 11th Floor
New York, New York 10003
Direct: (347) 504-0220
E-Fax: (212) 409-8522
E-mail: iliana@kondiarislaw.com

ATTORNEYS FOR PLAINTIFF